# GEORGE JUNIOR DOYE *v.* STATE OF MARYLAND

[No. 163, September Term, 1972.]

*Decided January 5, 1973.*

512

The cause was argued before THOMPSON, GILBERT and SCANLAN, JJ.

*John T. Bell,* with whom were *Charles W. Bell, Frank S. Cornelius* and *Bell & Bell* on the brief, for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, J. Owen Wise, State's Attorney for Caroline County,* and *Thomas L. Craven, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

George Junior Doye, appellant, was convicted in the Circuit Court for Caroline County, Judge B. Hackett Turner, Jr. presiding with a jury, of committing rape and perpetrating unnatural and perverted sexual practices. Consecutive sentences of 20 and 10 years, respectively, were imposed. Doye contends certain evidence was improperly admitted at the trial and that he was improperly required to remove his jacket and roll up his sleeves to assist in the witness's identification.

The victim, at the time of the crime was a 17 year old high school student. She testified that about 4:30 p.m. on the 13th of July, 1970, she left two children for whom she was babysitting, at the Mohican Hills Swimming Pool in Montgomery County. Upon entering the parking area, she noticed seven to ten persons gathered around two cars with flat tires. She proceeded along a wooded path—a three-block long shortcut—from the parking lot enroute to Glen Echo Heights. As she walked, someone put his left arm around her neck and extended his right arm in front of her brandishing a knife. She saw a red bandana with what she thought was "a little white . . . in the area of his neck or face." With the knife placed against the small of her back, the witness was ordered farther into the woods where her assailant wrapped her head with her towel and forced her to participate in an

act of fellatio and then to submit to sexual intercourse. She described the man as approximately her height with muscular arms pigmented "chocolate brown" or a little lighter, "sort of slender" hips, between 20 and 25 years of age.

The witness identified a red bandana with white markings as being "similar" to the one worn by her assailant. She identified a white handled knife as the one used by her assailant, pointing out that it was distinguishable because of a "lip—it's a little jut thing—and it seemed, I knew it wouldn't fold down because of the way it was constructed and the handle was sort of dirty and white."

Also admitted into evidence were a pair of trousers which the victim characterized as "very similar to the ones that I saw at the time, the color is the same."

She testified that the man in the third position at the lineup she had attended was similar in height, build and in the growth of hair on his chin to her attacker. That man's voice also sounded like her assailant when he was asked in the lineup to repeat the words, "Don't shout, don't scream—." She then identified the appellant as the man who had appeared in the lineup and who looked and sounded like her assailant.

When the appellant was required to exhibit his arm to the witness, she characterized it as muscular and the same in color as that of her attacker. She stated that the lineup photograph depicted the appellant with a goatee whereas he was not wearing one at the time of trial.

Catherine Betty Yoklavitch testified that on the 13th of July, 1970, she saw a man on the parking lot adjacent to the Mohican Hills Pool who looked like the appellant. When shown the photographs exhibited shortly after the incident, the witness selected the "man third on the left in all these photos," further asserting that the appellant was now wearing a longer hairstyle and appeared to be more clean-shaven. He wore a knit shirt, gray pants, and an untrimmed growth of hair on his face when observed on the parking lot.

Further describing her encounter with the man, the

witness stated that she got into her car and began backing it out of the parking lot when "it went 'clonk'." She emerged from the car to discover she had a flat tire. She called to a man "going into the woods" and asked whether or not he saw "any kids fooling with my car," whereupon the man replied he had seen no one and was "just passing through." The man "walked right up" to the witness and the two conversed for "not more than three minutes." She considered asking him to assist her in changing the tire, but decided otherwise when she remembered she had no money.

The witness described the man as young and "strong-looking" but "a little thick through the waist for a young man." Asked if the defendant were the man she talked to she replied, "It's been a long time . . . I believe it is." She later testified that a man she saw at a preliminary hearing was the same man "that I'd seen and talked to at the swimming pool." Yoklavitch further described the man she encountered in the parking lot as wearing a knit shirt and light gray cotton trousers.

Charles Montrie, a high school student, testified that he left the Mohican Hills Swimming Pool in the company of his girlfriend, Janet Pettis, and her brother Raymond, on July 13, 1970, at approximately 3:30 p.m. As the three proceeded on a path that leads from the pool to Walhondy Road, the witness met and exchanged greetings with a stranger passing in the opposite direction. He described the man as "5'6", 5'7", . . . stocky, he had a goatee, a medium bush, . . . a neckerchief around his neck . . . [and] a red neckerchief dangling from his pocket." He identified appellant as that man.

Two days later, the witness went to the Sycamore Store with his girlfriend and was buying a soft drink when appellant entered the store. Montrie looked away so that he would not appear to be staring. After appellant left, the witness "waited at the door" and then went to an outside telephone booth to call the police. From about 200 feet he observed appellant "walking up the road, he was almost around the curve and he turned

around and saw me and . . . ran around the curve so that I couldn't see him anymore."

The witness indicated he had selected appellant at the lineup because "he was the one I saw on the path and then again in the store." He observed the man fifteen seconds on the day of the crime and approximately a half a minute on July 15th. On cross-examination he further stated, "I would say that I am fairly sure that [the appellant] is the same man I saw on the path."

Janet Pettis, a sixteen year old eleventh grade student at Walt Whitman High School, testified that on July 13, 1970, she left the Mohican Hills Swimming Pool with Charles Montrie and her brother at approximately 3:45 p.m. The trio met a black man proceeding down a path in the opposite direction. She testified, as had Montrie, that the man said "hi" and that the three responded with a similar greeting.

At the time of the pathway confrontation, she looked directly into the man's eyes as he passed and noticed that he had on a pair of gray pants, an orange-yellow shirt, a blue neckerchief around his neck and a red and white neckerchief hanging from his pocket. Pettis also related the incident which occurred at the Sycamore Store two days later, adding that she saw the man on a third occasion at the police lineup and once again at the preliminary hearing. She asserted she was "ninety percent positive" that the man she saw on the path and again at the Sycamore Store, was the appellant.

Norma Dana Speigel testified that on the day in question, she drove her daughter to the swimming pool, stopping her car at the intersection of Walhondy Road and the path where the preceding witnesses observed appellant. There she saw a man standing with his foot on a concrete rampart of the bridge approximately fifty feet away. She identified appellant as that man. She stated that he was carrying a brown paper bag, wore a cap and that he had a red handkerchief, "very prominently protruding from either a pocket or just out of his belt." The witness identified State's Exhibit 10-H as the photo-

graph of appellant she had selected sometime before the lineup as depicting the man she saw on the bridge near the path.

Lieutenant Robertson testified that the officers, executing a search warrant on a black 1960 Dodge registered to appellant's wife, seized a brown handled steak knife with a four inch blade, a steak knife with a four and $\frac{3}{8}$ inch blade and bone-colored handle, a yellow skull-type cap, and a State of Maryland Department of Employment Security identification card bearing the name of George Doye.

Execution of a search warrant on the premises at 8711 Plymouth Street produced a brown-colored short-sleeved shirt from a closet, one red handkerchief and a multi-colored scarf from the dresser. From a second bedroom, they obtained a knife with a dark gray handle and a man's cap. State's Exhibit 1, the handkerchief, and State's Exhibit 13, the scarf, were identified and admitted into evidence.

The witness indicated that an arrest warrant was executed the day after the lineup, and that at that time Doye was wearing bluish-gray work trousers and a green T-shirt. At the time of the arrest Doye gave as his address 8711 Plymouth Street, Apt. 2 in Silver Spring.

Counsel for the appellant agreed to stipulate that a representative of the Department of Motor Vehicles would testify that the Dodge automobile in question was registered to Joan Doye of 8711 Plymouth Street, Silver Spring, Maryland.

The defense produced Ida Jean Warfield, a member of the Women's Army Corps stationed at Fort Myer, Virginia, who testified that on the 13th of July, 1970 at approximately 2:00 p.m., Doye came to her home.[1] She said that Doye had not gone to work that day because he had to "go up to see about his separation papers." She had been dating the appellant for quite some time,

---

1. On cross-examination she showed considerable confusion as to the date.

seeing him almost every evening. According to the witness, Doye had been living with his mother on Maple Avenue in Takoma Park and Benjamin Townsend had been living with the appellant's wife and another woman. She testified that she, her sister and one Robert Maule were riding in Mrs. Doye's automobile when the police stopped them and arrested the operator, Benjamin Townsend, thinking him to be the appellant.

The appellant did not testify.

## I Attack on Evidence Alleged to be Irrelevant and Prejudicial

Initially, Doye contends the trial judge committed error in admitting into evidence State's Exhibit No. 2, a white-handled steak knife which the victim identified as the one used by her assailant. He argues that the knife was not shown to have been exclusively in his possession because it was found in his wife's car several days after the crime and other persons had access to the car. In his argument he fails to distinguish between cases which turn on the possession of recently stolen goods or criminal tools, identified as being connected with a particular crime and the cases where a tool of a crime is offered simply as one link in a chain of circumstantial evidence. It is significant that appellant, while quoting at length from 1 Wharton, *Criminal Evidence*, § 203, (12th Edition) omitted the following quote from page 408:

> "It is also relevant to show that the defendant owned or *had access* to any article with which the crime was or *could have been committed.*" (Emphasis added).

The distinction is drawn much more sharply in 2 Wigmore, *Evidence*, § 412 (3d Ed., 1940):

> "The only matter that is here of concern is the *admissibility* of circumstantial evidence of identification; and it will easily be seen that very

few questions can arise from this point of view. The usual matter of dispute, when such evidence is offered, is whether it is sufficient to found a *presumption,* or, as a mass of evidence, to support a verdict; and in this aspect it raises an entirely different question."

Appellant seeks support from *People v. Urban,* 381 Ill. 64, 44 N.E.2d 885, 887 in which the court did not make the above distinction. The case is readily distinguishable because the decision turned on the question of exclusive possession of stolen goods.

The rule is well established that physical evidence need not be positively connected with the accused or the crime to be admissible; it is admissible where there is a reasonable probability of its connection with the accused or the crime, the lack of positive identification affects only the weight of the evidence. *Woodell v. State,* 2 Md. App. 433, 234 A. 2d 890; *Tomolillo v. State,* 4 Md. App. 711, 245 A. 2d 94. We hold the State's Exhibit No. 2 was properly admitted into evidence for consideration by the jury.

Appellant also cites *Riley v. State,* 179 Md. 304, 18 A. 2d 583 and *Sugarman v. State,* 173 Md. 52, 195 A. 324. These cases concern the admission of illegally seized evidence and are not apposite to his argument.

Appellant next argues the admission of the second knife, found in the search of the car, and the exhibition to the jury of the switchblade knife found in a bedroom, were "prejudicial." We fail to see how exposing the jury to two extra knives to which appellant had access could have been any more inflammatory than displaying one properly admitted and identified as being "similar to the one" used in the crime. We cannot say the trial judge abused his discretion in overruling objections that this evidence was inflammatory, although we agree the extra knives served no legitimate purpose in the trial and it would have been better practice to have excluded them.

Appellant argues further, however, that evidence show-

ing he had access to three knives indicated a propensity for knife ownership and as such, constituted the use of evidence of the type condemned in *Huber v. State,* 2 Md. App. 245, 234 A. 2d 264. In that case the testimony showed the assailant bound and unbound his female victim several times. We held it error to admit tracings, which artistry was attributed to the accused, of women in various conditions of bondage. The prejudicial effect of that evidence is patent. The mere access to two additional knives is hardly in the same category. While we do not condone the action of the prosecutor in displaying the additional knives to the jury, we can see no real prejudice to the accused.

There was objection to Mrs. Yoklavitch's testimony that at the time of her confrontation with appellant two of her tires as well as the tires of other cars in the vicinity had been punctured. Assuming such evidence should not have been admitted, we are again unable to see any prejudice to the accused who was in no way shown to be involved.

As we said in *Shotkosky v. State,* 8 Md. App. 492, 261 A. 2d 171, an accused is entitled to a fair, not a perfect, trial.

## II Search Warrant

Appellant claims the warrant which was obtained to search the car and the home failed to show probable cause. The state offered to place the warrant in the record without exhibiting it to the jury, but did not do so on the assurance of appellant that such procedure was unnecessary. We have repeatedly held that the validity of a search warrant must be determined solely on the face of the warrant and any accompanying papers incorporated therein, and not on subsequent testimony. *Scarborough v. State,* 3 Md. App. 208, 238 A. 2d 297; *Gerstein v. State,* 10 Md. App. 322, 270 A. 2d 331. Appellant bears the burden of seeing that there is included in the record all that is necessary for us to decide a question he raises. *Gray v. State,* 10 Md. App. 478, 271

A. 2d 390. Since he failed to supplement an inadequate record we decline to consider the question. *Vernon v. State,* 12 Md. App. 157, 277 A. 2d 635.

### III Photographic Identification

Appellant concedes we have held that the absence of counsel at a photographic identification will not affect the admissibility of the identification. *Conway v. State,* 15 Md. App. 198, 289 A. 2d 862; *Crenshaw v. State,* 13 Md. App. 361, 283 A. 2d 423. We decline to depart from our prior rulings. The testimony fails to show anything improper about the manner in which the photos were exhibited to any of the witnesses but appellant also makes the bald allegation in his brief that a visual review shows that photographic Exhibits 9A through 9C and 10A through 10K were impermissibly suggestive. Once again the photographs are not in the record and we decline to consider the question. *Gray v. State,* and *Vernon v. State, supra.*

### IV Self-Incrimination

The victim identified appellant as the man she identified at the lineup as being similar in appearance to her attacker. She testified that he was in court wearing a suit, a pink shirt and a cravat. The following colloquy then occurred:

"Mr. Craven: Your Honor, could the Defendant be requested to rise and remove his jacket and roll up his sleeve past the elbow?

Mr. Bell: Your Honor, we're going to lay an objection to that.

The Court: Alright, I'm going to overrule the objection, Mr. Bell, and ask your client to stand and do as he's been requested.

Mr. Craven: We'd ask that it be the sleeve nearest the Jury and the witness, your Honor.

The Court: Yes sir.

(Whereupon Defendant rose, removed his jacket and rolled up his sleeve as requested)

Q. Now, I ask you—can you see that arm from here?

A. Yes.

Q. What, if anything, do you notice about that arm?

A. Well, it's very muscular and it's the same color.

Q. Same color as what?

A. As the attacker —"

Appellant argues that *Allen v. State*, 183 Md. 603, 39 A. 2d 820 requires us to hold that he was coerced to produce evidence against himself in violation of the Maryland Declaration of Rights, Article 22 and the Fifth Amendment to the Constitution of the United States and therefore his convictions must be reversed. The Court in *Allen* was particularly careful in expressing the limitations of its holding, saying at 612-613: "It is to be borne in mind that the particular purpose in seeking to have the accused try on the hat was *not to aid in identifying him* by showing how he looked with it on or off, as in the case of *People v. Pecho*, 362 Ill. 568, 200 N. E. 860, where the compelled wearing of a hat was approved as an aid to identification, but was for the sole purpose of attempting to prove his ownership of this incriminating article. If the conformity or fit of the hat had been perfect, or convincingly close to perfection, that fact would have appeared from the enforced action of the accused. If the result of the experiment had been otherwise . . . the very fact that he objected to making it would have been prejudicial. In either event, it amounted to a clear case of testimonial compulsion." The exhibition in the instant case was intended only as an aid to the victim in identification and is thus squarely within the exception pointed out in *Allen*.

Nor do the Supreme Court opinions dealing with the Fifth Amendment require us to hold as appellant suggests. In discussing a case in which a witness testified that an accused put on an article of clothing and that it

fit him well, Mr. Justice Holmes observed, "But the pro-
hibition of compelling a man in a criminal court to be
witness against himself is a prohibition of the use of
physical or moral compulsion to extort communications
from him, not an exclusion of his body as evidence when
it may be material. The objection in principle would for-
bid a jury to look at a prisoner and compare his features
with a photograph in proof." *Holt v. United States,* 218
U. S. 245, at 252-253, 31 S. Ct. 2, at 6, 54 L. Ed. 1021
(1910).

More recently, the Court observed, "the privilege is a
bar against compelling 'communications' or 'testimony,'
but that compulsion which makes the suspect or accused
the source of 'real or physical evidence' does not violate
it." *Schmerber v. California,* 384 U. S. 757, at 764, 86 S.
Ct. 1826, at 1832, 16 L.Ed.2d 908 (1966). The Court
there held that incriminating evidence of the result of a
compelled blood test was not inadmissible on Fifth
Amendment grounds. In rejecting a claim that an in-
dividual's compelled vocal participation in a pre-trial
lineup violated his privilege against self-incrimination,
the Court in *United States v. Wade,* 388 U. S. 218, at 222-
223, 87 S. Ct. 1926, at 1930, 18 L.Ed.2d 1149 (1967), ob-
served, "It is compulsion of the accused to exhibit his
physical characteristics, not compulsion to disclose any
knowledge he may have. It is not different from compel-
ling Schmerber to provide a blood sample or Holt to wear
the blouse, and, as in those instances, is not within the
cover of the privilege. Similarly, compelling Wade to
speak within hearing distance of the witnesses, even to
utter words purportedly uttered by the robber, was not
compulsion to utter statements of a 'testimonial' nature;
he was required to use his voice as an identifying physi-
cal characteristic, not to speak his guilt." In holding
that handwriting exemplars did not violate petitioner's
Fifth Amendment privilege against self-incrimination,
the Court in *Gilbert v. California,* 388 U. S. 263, at 266-
267, 87 S. Ct. 1951, at 1953, 18 L.Ed.2d 1178 (1967)
stated, "A mere handwriting exemplar, in contrast to

the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the] protection [of, the privilege against self-incrimination.]"

The privilege against self-incrimination has evolved to protect only communicative or testimonial statements rather than "identifying physical characteristics" or compulsion making the accused a source of "real or physical evidence." *Schmerber, supra,* 384 U. S. at 764, *United States v. Wade, supra,* 388 U. S. at 222-223. See *Simms v. State,* 4 Md. App. 160, 242 A. 2d 185. Compelling appellant to expose his forearm to the jury and the victim, a part of the body sometimes not concealed by ordinary attire, the Court was requiring the appellant to submit to observations infringing no more upon the privilege than compelling him to "submit to fingerprinting, photographing or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk or to make a particular gesture" recognized as permissible in *Schmerber, supra,* 384 U. S. at 764.

*Judgments affirmed.*