560 A.2d 1108

Nancy CHOI

v.

STATE of Maryland.

No. 184 Sept. Term, 1987.

Court of Appeals of Maryland.

July 21, 1989.

530

Paul F. Kemp (Catterton, Kemp & Mason, all on brief) Rockville, for appellant.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief) Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ELDRIDGE, Judge.

On January 4, 1987, Tai–Sun Choi was arrested for killing his wife, Suf–Lin Choi, earlier that day. Subsequently Tai–Sun Choi was charged, in the Circuit Court for Montgomery County, with murder. The State served a subpoena on Nancy, the Choi's 19–year–old daughter, and the defendant in the case at bar, requiring her to appear as a witness at Tai–Sun's trial. At the trial in October 1987, Nancy refused to answer questions by the State on the ground that her answers would incriminate her. The circuit court, without deciding whether Nancy would have been entitled

to assert the privilege against self-incrimination absent waiver, held that she had waived any right to claim the privilege. The court directed Nancy to answer the State's questions, but she reasserted her privilege against compelled self-incrimination. Thereafter, the court adjudicated Nancy guilty of contempt, and Nancy appealed to the Court of Special Appeals. Before any proceedings in the intermediate appellate court, we issued a writ of certiorari to determine whether it was error for the trial court to have required that Nancy Choi answer the questions and to have adjudicated her in contempt for refusing to answer. We shall hold that it was error.

The pertinent facts underlying Nancy Choi's assertion of the privilege against compelled self-incrimination are as follows. On January 4, 1987, from a neighbor's phone, Michael Choi, the brother of Nancy and son of Tai–Sun Choi, called the police and informed them that his father had shot his mother. At the same time the Emergency Operation Center received a call, but, when an operator picked up the receiver, the caller had hung up. After tracing the number, the operator called back. Tai–Sun Choi answered the phone and said that he had shot his wife.

When the police and medical units arrived at the Choi's house, Suf–Lin Choi was dead. That night, upon being questioned by a detective of the Montgomery County Police Department, both Michael and Nancy gave written statements to the detective. Nancy's statement recited a long history of marital problems and violence between her parents. With respect to the night of the shooting, Nancy stated that she had been taken to the emergency room of a hospital by her mother because she was ill. When they returned, her mother went downstairs to see Tai–Sun. Then, according to Nancy's statement,

"[i]t wasn't five minutes and I heard a gunshot. First we sat there and then I heard something fall—like a body, and then we went downstairs. My mom was on the kitchen floor on her back. Her eyes were wide open and she said something but I don't know what.... His back

was turned to us and he closed the door on my face. I tried to open them but he wouldn't let me in. He had his back against them. Then I heard another shot. That's when I ran out. The only thing he said was 'get out.' "

Shortly before Tai–Sun Choi's trial, an attorney representing both Nancy and Michael informed the circuit court that, if called as witnesses, both children would invoke the privilege against compelled self-incrimination. In an *in camera* proceeding, Nancy's attorney informed the court that Nancy's testimony at trial would be materially different, with respect to both the marital disputes and the sequence of gunshots, from the statement which she had given the detective.[1] Consequently, according to the attorney, Nancy might be subject to prosecution for making a false statement to a police officer. *See* Code (1957, 1987 Repl.Vol.), Art. 27, § 150.[2]

At the trial, the State called Nancy Choi as a witness. Because she had been advised by her attorney to assert the privilege on a question-by-question basis, Nancy answered some preliminary questions including the following:

"Q  All right.  Your cousin's name?

"A  Tony Choi.

"Q  Age?

"A  Twelve.

---

1.  At trial, Tai–Sun Choi alleged that he had shot his wife in self-defense. The timing of the shots and the marital disputes, therefore, were important.

2.  Art. 27, § 150 provides:

"**§ 150.  False statements, etc., to peace or police officers.**

Any person who makes a false statement, report or complaint, or who causes a false statement, report or complaint to be made, to any peace or police officer of this State, or of any county, city or other political subdivision of this State, knowing the same, or any material part thereof, to be false and with intent to deceive and with intent to cause an investigation or other action to be taken as a result thereof, shall be deemed guilty of a misdemeanor and upon conviction shall be subject to a fine of not more than five hundred dollars ($500.00), or be imprisoned not more than six (6) months, or be both fined and imprisoned, in the discretion of the court."

"Q   Okay.   How long has he been living with you?
"A   Oh, about—since the accident happened.
"Q   What do you mean, the accident?   The death of your mother?
"A   Yes, sir.
"Q   Is that what you are referring to?
"A   Yes, sir."

After some questions concerning Nancy's education and her father's occupation, the questioning turned to the death of her mother.   Nancy declined to answer any questions about her mother's death on the ground that her answers would incriminate her.   After Nancy refused to heed the court's direction that she answer and warnings that she would "go to jail," the court found Nancy in contempt.   The court then instructed the deputy sheriff to take Nancy Choi to jail.   Thereafter, she was released on bond and instructed to appear before the court the following week.   On that date, Nancy again refused to answer questions relating to her mother's death.   The court informed her that her earlier answer describing the death of her mother as an "accident," was "of such a nature that you effectively have waived your privilege against self-incrimination."   Nancy contended that she had mistakenly said "accident" and that she had intended to say "incident."   Concluding that Nancy's intent was irrelevant, the court held her in contempt.   The court imposed a sentence of six months in the Montgomery County Detention Center and placed her on $1,000.00 personal bond pending appeal.

In this Court, Nancy argues that the contempt adjudication was erroneous and that her privilege against compelled self-incrimination entitled her to refuse to answer.   She maintains that her answer might have produced evidence that she had violated Art. 27, § 150.

The State makes two alternate arguments in response.   First the State insists that Nancy was not entitled to invoke the privilege against self-incrimination.   In making this argument, the State takes the position that, if her January

4, 1987, statement to the police detective was false, Nancy would have violated Art. 27, § 150. The State asserts, however, that Nancy could not invoke the privilege because she "had no reasonable basis for fearing prosecution for the crime of making a false statement to a police officer...." (Respondent's brief, 10). The State relies on the trial judge's statement that "witnesses often changed versions of an incident and are never prosecuted for making a false statement to a police officer." (*Id.* at 11). The State also relies on the prosecuting attorney's representation in the court below that Nancy "was not at risk of prosecution." (*Ibid.*).

Second, the State contends that, even if Nancy was entitled to invoke the privilege, the trial court's order was nonetheless proper. It is the State's position that her previous answer, characterizing her mother's death as an "accident," constituted a waiver of her privilege against compelled self-incrimination.

## I.

Recently Judge Blackwell for the Court, in *Adkins v. State*, 316 Md. 1, 6–7, 557 A.2d 203, 205–206 (1989), reiterated that "[t]he privilege against compelled self-incrimination is guaranteed under both the Fifth Amendment of the United States Constitution and Art. 22 of the Maryland Declaration of Rights.... Upon assertion of the privilege by a witness, the court must determine whether there is a reasonable basis for the invocation of the privilege and whether the privilege is invoked in good faith." [3]

---

3. The Court also noted in *Adkins*, 316 Md. at 6 n. 5, 557 A.2d at 205 n. 5, that "[t]he privilege contained in Art. 22 is generally '*in pari materia* with its federal counterpart,'" citing several prior Maryland cases. There appear to be only two situations where the privilege under Art. 22 has been viewed differently, and more broadly, than the privilege under the Fifth Amendment. One situation involves a witness-defendant being asked at his trial to try on an item of clothing in order to establish his ownership of it and thereby connect him with the crime. *Allen v. State*, 183 Md. 603, 39 A.2d 820 (1944). *See e.g., Andrews v. State*, 291 Md. 622, 634–635, 436 A.2d 1315 (1981); *Journigan v. State*,

As previously indicated, the State's first argument is that Nancy Choi had no reasonable basis to invoke the privilege. Nevertheless, the State construes Art. 27, § 150, so as to cover Nancy's January 4, 1987, statement to the police detective. The State agrees with Nancy's counsel that, if the January 4th statement were false, Nancy would have violated the criminal statute. The thrust of the State's argument is that there was little likelihood that Nancy would actually have been prosecuted under § 150.

This Court has repeatedly emphasized that the privilege against compelled self-incrimination, under both the Fifth Amendment and Art. 22 of the Declaration of Rights, "must be accorded a liberal construction in favor of the right that it was intended to secure." *Adkins v. State, supra,* 316 Md. at 8, 557 A.2d at 206; *In re Maurice M.,* 314 Md. 391, 397, 550 A.2d 1135 (1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1636, 104 L.Ed.2d 152 (1989); *Ellison v. State,* 310 Md. 244, 258, 528 A.2d 1271 (1987); *State v. Comes,* 237 Md. 271, 282, 206 A.2d 124 (1965); *Allen v. State,* 183 Md. 603, 607, 39 A.2d 820 (1944).

We have consistently applied the standards of *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), that a witness is entitled to invoke the privilege against self-incrimination if "the witness has reasonable cause to apprehend danger from a direct answer" (341 U.S. at 486, 71 S.Ct. at 818) and that (341 U.S. at 486–487, 71 S.Ct. at 818):

---

223 Md. 405, 411–412, 164 A.2d 896 (1960), *cert. denied,* 365 U.S. 853, 81 S.Ct. 818, 5 L.Ed.2d 817 (1961); *Davis v. State,* 189 Md. 640, 644–645, 57 A.2d 289 (1948); *Shanks v. State,* 185 Md. 437, 444, 45 A.2d 85 (1945); *Doye v. State,* 16 Md.App. 511, 522, 299 A.2d 117, *cert. denied,* 268 Md. 747 (1973), with regard to the limited scope of the *Allen* ruling. The other situation, discussed later in this opinion, concerns waiver of the privilege by a witness who has just previously answered questions about the subject. *See Chesapeake Club v. State,* 63 Md. 446, 457 (1885) (opinion of Alvey, C.J.), 462 (opinion of Bryan, J.) (1885); 8 Wigmore, *Evidence,* § 2276, p. 458 n. 2 (McNaughton rev. 1961); Note, *Waiver of the Privilege Against Self–Incrimination,* 14 Stan.L. Rev. 811, 816 n. 22 (1962).

"To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."

The Court in *Hoffman* concluded that, in the case before it, the claim of privilege should have been allowed because the witness "could reasonably have sensed the peril of prosecution" and because "it was not *'perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." 341 U.S. at 488, 71 S.Ct. at 819, emphasis in original, quoting from *Temple v. Commonwealth,* 75 Va. 892, 898 (1881). For cases applying the *Hoffman* standards, *see, e.g., Adkins v. State, supra,* 316 Md. at 8, 557 A.2d at 206; *In re Maurice M., supra,* 314 Md. at 397, 550 A.2d at 1138; *Ellison v. State, supra,* 310 Md. at 252, 528 A.2d at 1275; *Richardson v. State,* 285 Md. 261, 266–267, 401 A.2d 1021, 1024–1025 (1979); *Smith v. State,* 283 Md. 187, 193, 388 A.2d 539, 542 (1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979); *Payne v. Payne,* 33 Md.App. 707, 714–715, 366 A.2d 405, 410 (1976), *cert. denied,* 280 Md. 733 (1977).

█ In light of these principles, we conclude that Nancy Choi was entitled, under both the Fifth Amendment and Art. 22 of the Maryland Declaration of Rights, to invoke her privilege against compelled self-incrimination.

The State in this case has persistently construed Art. 27, § 150, to encompass statements such as the one Nancy gave to the investigating police detective on January 4, 1987. It was apparent, and the State does not suggest otherwise, that, had Nancy testified at trial, her testimony would have differed materially from her earlier statement given to the police detective. Thus, either she made a false statement to the police detective on January 4th, or she would have been testifying falsely in court.

Although one may not claim the privilege against compelled self-incrimination out of fear that she will be prosecuted for perjury for what she is about to say, it is equally possible that the falsity was in Nancy's earlier January 4th statement. A witness is entitled to invoke the privilege against compelled self-incrimination when her testimony would contradict testimony at an earlier proceeding and could lead to a prosecution based on the *prior* testimony. *See, e.g., United States v. Partin,* 552 F.2d 621, 632 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) ("a witness may not claim the privilege out of fear that he will be prosecuted for perjury for what he is about to say, although he may claim the privilege if his new testimony might suggest that he had perjured himself in testifying on the same subject at a prior proceeding"); *United States v. Wilcox,* 450 F.2d 1131, 1141 (5th Cir.1971), *cert. denied,* 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 787 (1972) ("the aphorism that one cannot take the Fifth Amendment on the ground that if he testifies he will perjure himself ... does not mean that having once testified, the Fifth Amendment is not available to avoid giving further testimony which might expose the witness to ... risk of prosecutions growing out of the prior testimony"); *People v. Borjas,* 191 Colo. 218, 552 P.2d 26 (1976); *State v. Zamora,* 84 N.M. 245, 501 P.2d 689 (N.M.App.1972).

■ The thrust of the State's argument, as earlier mentioned, is that there is in fact little likelihood of Nancy Choi's prosecution under Art. 27, § 150, because prosecutions for violation of § 150 under these circumstances are rare and because the prosecuting attorney indicated that he would not prosecute her. The rarity of prosecutions under a particular statute, or a prosecuting attorney's indication in a particular case that he will not prosecute, are not sufficient to defeat a claim of privilege under the standards of *Hoffman* and other cases. In *United States v. Miranti,* 253 F.2d 135, 139 (2d Cir.1958), for example, the United States Court of Appeals for the Second Circuit stated:

"We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute. Such a rule would require the trial court, in each case, to assess the practical possibility that prosecution would result from incriminatory answers. Such assessment is impossible to make because it depends on the discretion exercised by a United States Attorney or his successor."

*In re Corrugated Container Antitrust Litigation*, 661 F.2d 1145, 1150–1151 (7th Cir.1981), *aff'd sub. nom., Pillsbury Co. v. Conboy*, 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983), was a case where the trial judge denied a witness's claim of Fifth Amendment privilege on the ground that the judge did not believe that the witness would face prosecution under a state statute because the judge was unaware of any state litigation under that statute. In reversing, the United States Court of Appeals for the Seventh Circuit emphasized (661 F.2d at 1150–1151):

"First, and most fundamental, as this court recently held, the protection of the Fifth Amendment applies so long as there is a *possibility* of prosecution, regardless of a judge's assessment of the likelihood of prosecution. *In re Folding Carton Antitrust Litigation, Appeal of R. Harper Brown*, 609 F.2d 867 (7th Cir.1979). We concluded in *Brown:*

'Short of the existence of one of these indicia [*viz.*, statute of limitations, immunity, double jeopardy] of an *absolute bar* to subsequent prosecution, a judge's prediction as to the likelihood of a prosecutor filing an indictment is not dispositive in ascertaining the permissible scope of a claim of Fifth Amendment privilege.' 609 F.2d at 872 (footnotes omitted) (emphasis added)."

The same point was made by the Supreme Court of Wisconsin in *Matter of Grant*, 83 Wis.2d 77, 264 N.W.2d 587 (1978). The witness in that case was asked whether she had engaged in sexual intercourse with an individual, and

the witness declined to answer, claiming the privilege against self-incrimination and referring to statutes dealing with crimes against sexual morality. The trial Court held the witness in contempt. In reversing, the Supreme Court of Wisconsin referred to the government's argument that "few if any prosecutions" under the sexual morality statute are brought based on testimony in a case. The Court then said (264 N.W.2d at 591):

> "Despite the fact that it may be less than probable that Sheila Grant will be prosecuted ..., her fear of self-incrimination is sufficiently real and appreciable to be a valid exercise of her right."

To the same effect are cases upholding the refusal of witnesses to testify concerning sexual intercourse because of criminal adultery statutes, even though prosecutions under those statutes may be rare. *See, e.g., Payne v. Payne, supra,* 33 Md.App. at 713–715, 366 A.2d at 409–410; *de Antonio v. Solomon,* 42 F.R.D. 320, 323 (D.Mass.1967); *Vail v. Vail,* 360 So.2d 985, 989–990 (Ala.Civ.App.1977), remanded on other grounds, 360 So.2d 992 (Ala.1978).

■ *In re Master Key Litigation,* 507 F.2d 292 (9th Cir.1974), was an antitrust case in which one of the defendants' employees invoked the privilege against self-incrimination and refused to testify. The plaintiff, like the State in the instant case, argued that the witness "has no right to assert his privilege against self-incrimination because there is not the remotest chance that he could be criminally prosecuted for his part in the antitrust violations" (507 F.2d at 293). In response, the United States Court of Appeals for the Ninth Circuit stated (*ibid.*):

> "Although the federal government and the states do not appear particularly interested in bringing criminal actions against the defendant corporations or their employees, the right to assert one's privilege against self-incrimination does not depend upon the *likelihood,* but upon the *possibility* of prosecution. *See Hoffman v. United States,* 341 U.S. 479, 486–487, 71 S.Ct. 814 [818–

19], 95 L.Ed. 1118 (1951); *Isaacs v. United States*, 256 F.2d 654, 658 (8th Cir.1958)."

*See also, e.g., United States v. Jones*, 703 F.2d 473, 478 (10th Cir.1983) ("Once the court determines that the answers requested would tend to incriminate the witness, it should not attempt to speculate whether the witness will in fact be prosecuted"); *In re Corrugated Container Anti–Trust Litigation*, 620 F.2d 1086, 1091 (5th Cir.1980), *cert. denied*, 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981) ("even a remote risk, that the witness will be prosecuted for the criminal activities that his testimony might touch on," is sufficient to sustain a privilege claim); *United States v. Johnson*, 488 F.2d 1206, 1209 n. 2 (1st Cir.1973) ("Neither the practical unlikelihood of further prosecution, nor the Assistant United States Attorney's denial of an intention to charge [the witness], negated [the witness's] privilege"); *State v. Williams*, 200 Conn. 310, 511 A.2d 1000, 1005 (1986); *10–Dix Bldg. Corp. v. McDannel*, 134 Ill.App.3d 664, 89 Ill.Dec. 469, 475, 480 N.E.2d 1212, 1218 (1985); *People v. Guy*, 121 Mich.App. 592, 329 N.W.2d 435, 444 (1982); *Mississippi State Bar v. Attorney L.*, 511 So.2d 119, 124 (Miss.1987); *Application of Van Lindt*, 109 Misc.2d 686, 440 N.Y.S.2d 969 (1981); *Commonwealth v. Strickler*, 481 Pa. 579, 393 A.2d 313, 315 (1978); Note, *Self–Incrimination and the Likelihood of Prosecution Test*, 72 J.Crim. L. & Criminology 671 (1981).[4]

Because the State construes Art. 27, § 150, to be applicable to statements like that given by Nancy Choi to the police detective on January 4, 1987, and because of the

---

4. It should be noted that if the prosecuting attorney had been empowered by statute to have granted Nancy Choi immunity coextensive with the privilege, and if he had granted the immunity, she could have been compelled to testify. *See In re Criminal Investigation No. 1–162*, 307 Md. 674, 683, 516 A.2d 976 (1986), and cases there cited. Nevertheless, as many of the previously discussed cases point out, a mere expression by the prosecuting attorney that the witness will not be prosecuted is not a basis for compelling the witness to testify. *See, e.g., United States v. Johnson*, 488 F.2d 1206, 1209 n. 2 (1st Cir.1973). *Commonwealth v. Strickler*, 481 Pa. 579, 584, 393 A.2d 313 (1978).

apparent material discrepancy between Nancy's January 4th statement and what her trial testimony would have been if she had testified, Nancy was entitled to invoke her privilege against compelled self-incrimination. The State's assertion that, as a practical matter, prosecution under § 150 would have been unlikely, even if true, furnishes no proper basis for denying the claim of privilege.

## II.

■ Turning to the State's alternate argument, we reject the contention that Nancy Choi waived her privilege against compelled self-incrimination.

The State's waiver argument is based entirely on Nancy Choi's use of the word "accident" to describe her mother's death. The State's question, to which Nancy was responding, did not directly concern the shooting but related to how long Nancy's cousin had been living at the Choi residence. The critical part of the testimony was as follows:

"Q Okay. How long has he been living with you?

"A Oh, about—since the accident happened.

"Q What do you mean, the accident? The death of your mother?

"A Yes, sir."

Under the self-incrimination clause of the Fifth Amendment, if a sworn witness answers incriminating questions, the answers may constitute a waiver of the federal privilege against compelled self-incrimination with regard to further disclosure about the same subject. As explained in the leading case of *Rogers v. United States,* 340 U.S. 367, 372–373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951):

"Since the privilege against self-incrimination presupposes a real danger of legal detriment arising from the disclosure, petitioner cannot invoke the privilege where response to the specific question in issue here would not further incriminate her. Disclosure of a fact waives the privilege as to details. As this Court stated in *Brown v. Walker,* 1896, 161 U.S. 591, 597, 16 S.Ct. 644, 647, 40

L.Ed. 819: 'Thus, if the witness himself elects to waive his privilege, as he may doubtless do, since the privilege is for his protection and not for that of other parties, and discloses his criminal connections, he is not permitted to stop, but must go on and make a full disclosure.'

"Following this rule, federal courts have uniformly held that, where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details."

*See also In re Maurice M., supra,* 314 Md. at 405–406, 550 A.2d at 1142, and cases there cited.

Nevertheless, as Chief Judge Murphy recently pointed out for the Court in the *Maurice M.* case (314 Md. at 406, 550 A.2d at 1142), waiver of the Fifth Amendment privilege against self-incrimination "is not lightly to be inferred," and

"[a] statement will not preclude a refusal to make further disclosures on Fifth Amendment grounds unless it directly inculpates the witness and the witness could reasonably be expected to know that he might have waived the privilege. *See Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951)...."

Applying these principles, it is obvious that Nancy's use of a single ambiguous word "accident" in response to a preliminary question was not sufficient to constitute a waiver under the Fifth Amendment. Before the trial had even begun, Nancy had informed the trial court and the attorneys that she would assert the privilege. At the trial, Nancy took the stand and answered the introductory questions. As soon as the questioning turned to the death of her mother, Nancy invoked the privilege. This course of conduct does not suggest that "the witness could reasonably be expected to know that [she] might have waived the privilege." *In re Maurice M., supra,* 314 Md. at 406, 550 A.2d at 1142.

In addition, Nancy Choi's use of the word "accident" did not "directly inculpate" her. It was neither an admission nor clear evidence that she had lied to the police detective

on January 4, 1987. It is only because of the State's interpretation of the word "accident" that her testimony becomes inconsistent with her earlier statement to the police where she had suggested an intentional killing. It is difficult, however, to draw from a single word an inference that a statement was false.

Moreover, characterizing her mother's death as an "accident" is not necessarily in conflict with her prior statement. Certainly "accident" often connotes "an event or condition occurring by chance or arising from unknown or remote causes." Webster's Third New International Dictionary. The American Heritage Dictionary, however, defines accident as "an unexpected and undesirable event, a mishap." Under this usage, there was no inconsistency. There are many cases which, in various contexts, define "accident" to include an intentional wrongful act. For example, as pointed out by the Supreme Court of Illinois in *People ex rel. Compagnie Nationale v. Giliberto*, 74 Ill.2d 90, 23 Ill.Dec. 106, 109, 383 N.E.2d 977, 980 (1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2052, 60 L.Ed.2d 660 (1979), "it is now established that the hijacking of an airplane, and other acts of terrorism committed in the course of international flights, are 'accidents' within the meaning of article 17 [of the Warsaw Convention]." The word "accident" in criminal statutes has been construed to include intentional wrongs. *See, e.g., People v. Laursen*, 75 Cal.App.3d Supp. 1, 222 Cal.Rptr. 122 (1985); *People v. Martinson*, 161 Mich.App. 55, 409 N.W.2d 754, *appeal denied*, 429 Mich. 872 (1987); *State v. Parker*, 299 Or. 534, 704 P.2d 1144, 1149 (1985); *State v. Smyth*, 121 R.I. 188, 397 A.2d 497, 498–499 (1979).

Apart from the technical meaning of "accident," however, we do not believe that Nancy's mere use of that word, as a time reference in response to the question concerning the residence of her cousin, incriminated Nancy with respect to the January 4, 1987, statement and Art. 27, § 150. This is simply not a situation "where criminating facts have been voluntarily revealed" and the witness is trying to use the Fifth Amendment privilege "to avoid disclosure of the de-

tails." *Rogers v. United States, supra,* 340 U.S. at 373, 71 S.Ct. at 442.

▮ Finally, even if Nancy Choi had waived her Fifth Amendment privilege, she certainly did not waive her privilege against compelled self-incrimination under Art. 22 of the Maryland Declaration of Rights.  Long ago, in the leading case of *Chesapeake Club v. State,* 63 Md. 446, 457 (1885), this Court expressly rejected the waiver rule now prevailing under the Fifth Amendment and adopted the English rule that a witness's testifying about a matter does not preclude invocation of the privilege for other questions relating to the same matter.  Chief Judge Alvey there stated for the Court (63 Md. at 457):

> "Formerly it was thought, that if a witness chose to reply in part he might be compelled to answer everything relating to the transaction.  But that doctrine has been solemnly overruled, and it is now finally settled in the English Courts, that after a witness has been sworn he may claim his protection at any stage of the inquiry, and upon his so doing he cannot be compelled to answer any additional question that would tend to criminate him.  Therefore, notwithstanding the witness had testified without objection that he had gotten whiskey and beer at the clubrooms, he was entitled, upon further examination, to insist upon his privilege as to any additional fact that was sought to have disclosed by him, whereby he might criminate himself.  *Regina vs. Garbett,* 1 *Den.Cr.C.,* 236; 2 *Tayl.Ev., sec.* 1319; 1 *Greenl.Ev., sec.* 451; 1 *Whart. Cr.L., (7th Ed.) secs.* 805, 806."

*See also* 8 Wigmore, *Evidence,* § 2276, pp. 458, 460 (McNaughton rev. 1961) (pointing out that England, Maryland and New Jersey apparently do not recognize waiver by testifying about the subject);  Note, *Waiver of the Privilege Against Self–Incrimination,* 14 Stan.L.Rev. 811, 816 n. 22 (1962).  Under the *Chesapeake Club* holding, answering the question about her cousin's residency could not have waived

Nancy's Maryland constitutional privilege against self-incrimination with regard to later questions.[5]

We conclude, therefore, that the circuit court erred in adjudging Nancy Choi in contempt for her refusal to answer questions concerning her mother's death.

## III.

■ We have held that, at the time Nancy Choi was questioned in the trial court about her mother's death, she "could reasonably have sensed the peril of prosecution" under Art. 27, § 150, and "it was not perfectly clear" that her answers could not "possibly" have incriminated her under that statute.[6] A necessary predicate for this holding is that the State, both in the trial court and in this Court, has insisted that Art. 27, § 150, encompasses statements requested by and given to an investigating police officer under circumstances like those in the present case. For purposes of future attempts to invoke the privilege against compelled self-incrimination in similar circumstances, we shall examine the State's interpretation of § 150.

Art. 27, § 150, provides that any person

"who makes a false statement, report or complaint, or who causes a false statement, report or complaint to be made, to any peace or police officer of this State, or of any county, city or other political subdivision of this

---

**5.** While a different and unrelated holding in the *Chesapeake Club* case was limited to its peculiar facts in *Butz v. State,* 221 Md. 68, 73, 156 A.2d 423 (1959), the waiver holding of *Chesapeake Club* has never been questioned by this Court. Moreover, the separate question by question procedure for claiming the self-incrimination privilege, set forth in *Chesapeake Club,* has been repeatedly cited with approval by this Court. *See, e.g., Shifflett v. State,* 245 Md. 169, 173, 225 A.2d 440 (1967); *Midgett v. State,* 223 Md. 282, 289, 164 A.2d 526 (1960), *cert. denied,* 365 U.S. 853, 81 S.Ct. 819, 5 L.Ed.2d 817 (1961); *Adams, Nelson, and Timanus v. State,* 200 Md. 133, 144, 88 A.2d 556 (1952); *Raymond v. State ex rel. Younkins,* 195 Md. 126, 129–130, 72 A.2d 711 (1950).

**6.** The quoted language is from *Hoffman v. United States,* 341 U.S. 479, 488, 71 S.Ct. 814, 819, 95 L.Ed. 1118 (1951).

State, knowing the same, or any material part thereof, to be false and with intent to deceive *and with intent to cause an investigation or other action to be taken* as a result thereof"

is guilty of a misdemeanor. (Emphasis added). Clearly, in enacting this statute, the General Assembly intended to proscribe false reports of crimes and other statements which instigate totally unnecessary police investigations. The statute, however, does not expressly proscribe a false response to police questioning after an investigation has already begun.

As the statutory language shows, an element of the offense is the intent to cause an investigation or other action to be taken. In our view, this element is not satisfied when a false statement results from an interview as part of an ongoing police investigation. Rather, there must be a false report of a crime or a statement with the intent to cause other action to be taken. Applying the doctrine of *ejusdem generis,*[7] the "other action" must be of the same general nature as the initiation of an investigation.

Our view appears to be shared by the United States District Court for the District of Maryland. *Thompson v. Anderson,* 447 F.Supp. 584 (D.Md.1977). In examining Art. 27, § 150, that court suggested (447 F.Supp. at 588):

"The statute's inclusion of the element of *intent* to cause an investigation or the like may have been intended to restrict its application solely to false reports of crimes. The only cases interpreting the statute are consistent with that reading.... [It is] arguable that lying to the

7. "Under the doctrine of *ejusdem generis,* where 'the general words in a statute, such as "other things of value" ... follow the designation of particular things or classes of subjects, ... the general words in the statute will usually be construed to include only those things of the same class or general nature as those specifically antecedently mentioned.'" *Rucker v. Harford County,* 316 Md. 275, 295, 558 A.2d 399 (1989), *quoting State v. Sinclair,* 274 Md. 646, 658, 337 A.2d 703 (1975).

police is at best an activity not covered by any existing statute or common law doctrine."

In addition, other courts have interpreted analogous statutes in a like fashion. In *City of Columbus v. Fisher*, 53 Ohio St.2d 25, 372 N.E.2d 583 (1978), for example, the Ohio Supreme Court interpreted a municipal ordinance that created an offense of knowingly making a false statement "with [the] purpose to mislead a public official in performing his official functions." That ordinance, however, did not include the additional element of "intent to cause an investigation." Because of the potential abuses of the statute, the court observed that the ordinance "must be given a limitative construction." 53 Ohio St.2d at 29, 372 N.E.2d at 585. Thus, the court concluded that the ordinance was never

"intended to make the utterance of unsworn oral misstatements, in response to inquiries initiated by law enforcement officials, punishable conduct." (*Ibid.*)

See also *People ex Rel. Morris v. Skinner*, 67 Misc.2d 221, 222–224, 323 N.Y.S.2d 905 (Sup.Ct.1971).

In our view, even if Nancy's statement to the police detective on January 4, 1987, contained false representations, that would not justify a prosecution under Art. 27, § 150. Her statement did not instigate the investigation. The investigation began as a result of phone calls by Michael and Tai–Sun Choi. Nancy was a witness who was questioned by the police after the investigation began.

Consequently, while Nancy Choi previously had a reasonable basis to fear prosecution because of the State's interpretation of Art. 27, § 150, henceforth a witness under the same circumstances will not be entitled to invoke the privilege against self-incrimination based upon the possibility of prosecution under § 150.

JUDGMENT REVERSED. MONTGOMERY COUNTY TO PAY COSTS.