591 A.2d 488

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Maynard R. ROHRBACK.**

**Misc.Docket (Subtitle BV) No. 25, Sept. Term, 1989.**

Court of Appeals of Maryland.

June 26, 1991.

Walter D. Murphy, Jr., Deputy Bar Counsel for the Atty. Grievance Com'n of Maryland, for petitioner.

Robert L. Hanley, Jr., Towson, and M. Albert Figinski, Baltimore, as amicus curiae, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and KARWACKI, JJ., and CHARLES E. ORTH, Jr., Judge (retired) Specially Assigned.

RODOWSKY, Judge.

Respondent, Maynard R. Rohrback (Rohrback), is a solo practitioner whose office is in the Glen Burnie area of Anne Arundel County. One morning in August 1987 Rohrback received a telephone call from a client who had been arrested and who had given a false name to the arresting officer. Rohrback was thereby plunged into a legal ethics nightmare, the conflict under Maryland's unique version of the new ABA Rules of Professional Conduct between his duty of confidentiality to his client and his duty of candor to tribunals and third parties. For a time Rohrback successfully navigated the course, but, ultimately, he was carried over the edge.

Rohrback's client was Lloyd Francis Asbury (Asbury), an alcoholic construction worker and former Florida resident. In late December 1986 Asbury had consulted Rohrback concerning marital law problems. Asbury also owned one or more properties in Glen Burnie, which were tenanted in whole or in part and with respect to which Rohrback had represented Asbury.

On February 28, 1987, Asbury had been arrested in Anne Arundel County for driving while intoxicated (DWI). A few days thereafter Asbury retained Rohrback for the criminal charges and for related proceedings before the Motor Vehicle Administration (MVA), arising out of Asbury's refusal to take a chemical test for intoxication.

Asbury had at least three prior convictions for DWI or for driving under the influence of alcohol (DUI), two of which were within the five years preceding the Anne Arundel County arrest. His Maryland driver's license had been revoked from October 1984 to January 1986 because of a May 1984 DWI conviction. Prior to that, Asbury's license had been suspended because of a September 1982 DUI conviction. At the March 1987 MVA hearing Asbury's license was again suspended, this time for nine months, with any reinstatement conditioned on Medical Board approval. Rohrback noted an appeal on Asbury's behalf from

this administrative determination, but that appeal was later voluntarily dismissed.

In connection with the DWI charges of February 1987 the State's Attorney for Anne Arundel County gave notice that Asbury would be charged as a subsequent offender. Originally set for trial in the District Court in July, the case was removed by prayer for jury trial to the Circuit Court for Anne Arundel County where, on August 25, it was awaiting trial.

Early in the morning of August 25, in Baltimore City, Asbury was again arrested for DWI and again refused a breath test. Asbury identified himself to the arresting officer as Lloyd Francis Boland and presented a Florida driver's license issued to him in that name at a Florida address. Asbury was taken to the Southern Police District in Baltimore City and booked as Boland with the Florida address.

Before Rohrback had left his home on the morning of the 25th he received a telephone call from Asbury who was confined at the Southern District. Asbury asked Rohrback to get him out of jail on bail. They agreed on a $250 legal fee which was later paid. Asbury told Rohrback to ask for him under the name of Boland, explaining that he had a Florida license issued to him as Lloyd Francis Boland which he had presented to the arresting officer.[1]

At the lock-up Rohrback told Asbury that Rohrback would have to tell the bail bondsman that "Boland" was Asbury, that Asbury had another DWI charge pending, and that the correct address was Asbury's address in Glen Burnie. Asbury consented to these disclosures. Rohrback also told Asbury that Rohrback would attempt to get for

---

1. In the proceedings now before us Rohrback testified, based on information obtained from Asbury in a conversation at the lock-up on the morning of August 25, 1987, that Asbury had been adopted in Florida. Rohrback was not clear on which name is that of the birth parents and which name is that of the adoptive parents. In any event, this case has proceeded on the basis that Asbury is the true name and Boland a fictitious name, and not the reverse.

Asbury other counsel to try the criminal charges, because Rohrback felt very uncomfortable over Asbury's having given the name Boland to the arresting officer.

Rohrback telephoned a bondsman, disclosing that "Boland" was Asbury, that Asbury had another DWI charge pending in Anne Arundel County, that his residence was in Glen Burnie and not Florida, and that Rohrback believed Asbury was a good risk.

Asbury, as Boland, and the bondsman appeared before a Commissioner of the District Court. Bail was set at $1,000. The bondsman completed the District Court bail bond form in the name of Boland, using Asbury's Glen Burnie address. Asbury signed the form as Boland and the bondsman signed for the surety. The commissioner signed under a line reading "SIGNED, sealed, and acknowledged before me."

Rohrback was in the same room during these proceedings before the commissioner, but he remained at some unspecified distance from Asbury and the bondsman.[2] Rohrback remained silent, neither identifying himself as counsel for "Boland," nor telling the commissioner that "Boland" was Asbury.

In these disciplinary proceedings Rohrback was asked if he did not "feel a duty ... to tell the Commissioner of the two names." Rohrback replied:

"I, again, was torn because I knew that he was being charged under Boland and he had the other charges under Asbury, and I wasn't sure whether I should say anything to the Commissioner or not, because Mr. Asbury had made it plain to me back in the lock-up that his main concern was getting out of that jail. That is what he had me there for, and he told me if they know about me being

---

**2.** Bar Counsel introduced Rohrback's written reply to the initial complaint received by Bar Counsel. In that reply Rohrback said:
"I did not take part in the discussion [before the Commissioner] although I was in the same room. I did not hear any of the representations made by Mr. Asbury."

Asbury, they are either going to make me post a lot of bail or they might not even release me at all, so I don't want them to know. [He s]aid I am going to go through with it as Boland."

While Rohrback was at the Southern District that morning, he placed a telephone call to a fellow attorney and private practitioner, seeking advice on how to handle the situation. That attorney was either unavailable or unable to give an immediate answer.

Following Asbury's release on bail as Boland, Rohrback repeatedly urged Asbury to reveal, or to authorize Rohrback to reveal, that Boland was Asbury. Rohrback also talked to other attorneys about his dilemma. Without revealing his client's identity Rohrback spoke to an Assistant State's Attorney for Baltimore City who was assigned to the Southern District and who suggested that Rohrback discuss the matter with a specified, more experienced prosecutor. Rohrback spoke with that prosecutor, who suggested that Rohrback explain the facts to the arresting officer who might then change the name of the defendant on the Maryland Uniform Complaint and Citation forms which that officer had issued. Rohrback attempted to reach the officer by telephone and left messages, but the officer did not return the calls.

The criminal charges against "Boland" were set for trial on October 19, 1987, before the District Court in Baltimore City. Rohrback had not agreed to represent Asbury at that trial. A few days prior to the trial date, Rohrback, while in Ocean City, Maryland, received word through his secretary that Asbury wanted Rohrback to represent him. Rohrback sent word back to Asbury that Rohrback could not appear, that Asbury should appear unrepresented, and either obtain a postponement or, if that were denied, pray a jury trial.

Asbury appeared unrepresented on October 19 in the courtroom of Judge Andre Davis, then of the District Court. Utilizing powers of observation that had been fine tuned by experience, Asbury concluded that Judge Davis was grant-

ing probation before judgment (PBJ) in first offender DWI cases, and imposing a fine.[3] Asbury decided to stand trial. Judge Davis found "Boland" guilty, but, because Judge Davis noticed the Florida address on the complaint, he ordered a presentence investigation (PSI). Sentencing was scheduled for November 30.

On November 6 the Anne Arundel County DWI charges arising out of the February arrest came on for trial before Judge Bruce Williams. Rohrback appeared as counsel for Asbury and tendered a plea of guilty to DUI pursuant to a plea bargain. Under the bargain, the State made no recommendation concerning sentence. The prosecutor had Asbury's Maryland MVA record as Asbury, but did not know of Asbury's conviction, as Boland, of DWI in Baltimore City the prior month.

The proceedings before Judge Williams consisted of taking a knowing and voluntary guilty plea followed by the court's announcement that it would obtain a PSI. The court continued Asbury's bail. At no time did Judge Williams inquire about Asbury's record, and Rohrback did not voluntarily submit any information concerning it.

Judge Davis's request of October 19 for a PSI and Judge Williams's request of November 6 for a PSI were both referred to the same parole and probation agent, Wayne L. Lambert (Lambert). Rohrback urged Asbury to reveal his "dual identity" in the Baltimore City case to the probation officer. At times Asbury would agree to do so, but then, overcome by a fear of being imprisoned, he would change his mind and refuse to do so.

Eventually, Rohrback, as counsel, accompanied Asbury, as Boland, to a meeting with Lambert. Rohrback's explanation is that Asbury was extremely frightened, that he wanted Rohrback to be with him, and that Rohrback simply went along. Rohrback does not claim surprise that Asbury represented himself as Boland to Lambert on that occasion.

---

3. As to PBJ, see Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 641.

Rohrback did not disclose Asbury's misrepresentation to Lambert.

Lambert did not testify in the instant proceedings. In evidence is his letter to Rohrback's successor as counsel for Asbury, written in March 1988. It describes the following:

"When I initially contacted Mr. Boland, by phone, to schedule an appointment to interview him, he stated that he wanted his attorney present during the interview. I was later contacted, by phone, by an individual who identified himself as Mr. M. Rohrback and who also identified himself as being Mr. Boland's attorney. At that time, an appointment was scheduled at my office located in Parole Plaza Shopping Center in Annapolis, Maryland. It should be noted that the dates of the telephone conversations and appointments are unavailable to me at this time, as that material has been destroyed. An office interview was eventually conducted with Mr. Boland while Mr. M. Rohrback was present. I cannot recall if Mr. Rohrback ever displayed any identification; however, it was my assumption that he was representing Mr. Boland in the case. Very little was said by Mr. Rohrback during the entire interview."

At the sentencing on November 30 in Baltimore City, Asbury, as Boland, appeared *pro se* before Judge Davis. Rohrback was not present. Judge Davis granted Asbury, as Boland, PBJ, imposed a fine and costs, and placed him on two years supervised probation.

With respect to the PSI for Judge Williams, Lambert's letter advises that "Mr. Asbury failed to cooperate with me in scheduling an appointment so that he could be interviewed."

Sometime prior to February 24, 1988, Asbury changed counsel. On that date, represented by his new lawyer, Asbury appeared for sentencing before Judge Williams. The judge, who had a PSI, commented that Asbury had "been on probation three times for these offenses, this being his fourth under this name...." Asbury was sen-

tenced to one year in the Anne Arundel County Detention Center to be served on work release and with continued alcoholism counseling.

In May 1988 the State's Attorney for Baltimore City petitioned the District Court to correct the illegal imposition of PBJ in the case arising out of the August 25, 1987, DWI arrest. The court revised the sentence to one year's imprisonment, suspended execution of the sentence, and placed the defendant on supervised probation for three years.[4]

New counsel for Asbury brought Rohrback's representation of Asbury and of "Boland" to the attention of Bar Counsel. When charges were filed we referred them to Judge Martin A. Wolff of the Circuit Court for Anne Arundel County for hearing. Only Rohrback testified at that hearing. Bar Counsel's case rested on records of MVA, of the Baltimore City District Court case, and of the Anne Arundel County circuit court case, on Lambert's letter, and on the transcript of Rohrback's testimony before an inquiry panel. Judge Wolff concluded that, on three occasions, Rohrback violated the Maryland Lawyers' Rules of Professional Conduct, Maryland Rules, Title 12, Court Administration, Rule 1230 and appendix.[5]

The first occasion was on the morning of August 25, 1987, at the Southern District when Rohrback was found to have violated Rules 1.2(d) and 4.1(a). Rule 1.2, one of the rules dealing with "Client–Lawyer Relationship," provides:

"SCOPE OF REPRESENTATION.

. . . .

(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a

---

**4.** Interestingly, the order imposing the new sentence in the Baltimore City case is captioned State v. "Lloyd Boland."

**5.** Unless otherwise indicated all references to a rule will be to the Maryland Lawyers' Rules of Professional Conduct which became effective January 1, 1987.

client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law."

Judge Wolff concluded that Rohrback violated this rule "because he assisted in obtaining a bail bondsman to procure Asbury's release knowing that Asbury was using a false name. . . . The active participation in the fraudulent scheme for a fee clearly brings [Rohrback] in violation of this Rule."

In addition, Judge Wolff concluded that Rohrback violated Rule 4.1(a)(2) at the Southern District. Rule 4.1, one of the rules dealing with "Transactions With Persons Other Than Clients," reads:

"TRUTHFULNESS IN STATEMENTS TO OTHERS.

(a) In the course of representing a client a lawyer shall not knowingly:

(1) make a false statement of material fact or law to a third person; or

(2) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client.

(b) The duties stated in this Rule apply even if compliance requires disclosure of information otherwise protected by Rule 1.6." [6]

---

6. Rule 1.6 reads:
"CONFIDENTIALITY OF INFORMATION.
(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).
(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:
(1) to prevent the client from committing a criminal or fraudulent act that the lawyer believes is likely to result in death or substantial bodily harm or in substantial injury to the financial interests or property of another;
(2) to rectify the consequences of a client's criminal or fraudulent act in the furtherance of which the lawyer's services were used;
(3) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, or to establish a

This violation was predicated on Rohrback's "failing to disclose to the District Court Commissioner ... the false identity...."

The second occasion of a violation reported to us was at the arraignment before Judge Williams. Judge Wolff concluded that "Rohrback's failure to disclose to Judge Williams the fact that his client had another charge under the name of Boland would be a violation, since [Rohrback's] actions fall under [Rule] 3.3(a)(2) and he fits the exceptions to the confidentiality of information rule [Rule 6.1]." Rule 3.3, "CANDOR TOWARD THE TRIBUNAL," provides in relevant part:

"(a) A lawyer shall not knowingly:

. . . .

(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

. . . .

(b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

. . . .

(e) Notwithstanding paragraphs (a) through (d), a lawyer for an accused in a criminal case need not disclose that the accused intends to testify falsely or has testified falsely if the lawyer reasonably believes that the disclosure would jeopardize any constitutional right of the accused."

The third occasion involved the meeting with the probation officer. Judge Wolff concluded that Rohrback violated Rule 4.1 at that time "[i]n failing to disclose to ... Mr.

---

defense to a criminal charge, civil claim, or disciplinary complaint against the lawyer based upon conduct in which the client was involved or to respond to allegations in any proceedings concerning the lawyer's representation of the client.

(4) to comply with these Rules, a court order or other law."

Lambert, the pre-sentence investigator, the false identity...."

Rohrback excepts to all of the conclusions reached by Judge Wolff. In addition, we permitted the Maryland Criminal Defense Attorney's Association, as amicus curiae, to file a legal memorandum and to argue orally in support of Rohrback's position.

Rohrback argues, based on portions of his testimony, that he was concerned with preserving client confidences. Citing portions of Rohrback's testimony before an inquiry panel in which Rohrback expressed sympathy for Asbury's situation, Judge Wolff found that Rohrback could not "claim protection for his acts" under Rule 3.3(e) because "[t]his Court does not find that Rohrback reasonably believed that disclosure would jeopardize Asbury's constitutional rights."

## I

We shall first analyze Rohrback's conduct at the Southern District police station in response to Asbury's telephone call. In that conversation Asbury sought legal counsel. The content of the conversation was confidential under Rule 1.6(a).[7] Asbury revealed to Rohrback Asbury's commission of the offense of having operated a motor vehicle when Asbury's operator's license was revoked. That was a completed offense, and Rohrback had no duty to disclose that offense. "[Rohrback's] knowledge concern[ed] a completed crime, and [Rohrback] therefore had a duty *not* to report it; it would be hard to imagine a more serious

---

7. We need not decide whether, under the facts here, this is one of the unusual cases in which identity of the client is a privileged communication between client and attorney. It is noteworthy that implicit in the consultation was Asbury's problem of having given a false identity to the arresting officer. See Annot., *Attorney's Disclosure, in Federal Proceedings, of Identity of Client as Violating Attorney–Client Privilege,* 84 A.L.R.Fed. 852 (1987); Annot., *Disclosure of Name, Identity, Address, Occupation, or Business of Client as Violation of Attorney–Client Privilege,* 16 A.L.R.3d 1047 (1967).

violation of the law of lawyering if he did." 1 G. Hazard & W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* § 1.2:508, at 57 (2d ed. 1990) (*Lawyering* ). Asbury had also committed, unbeknownst to the arresting officer, the offense of giving a "fictitious name to any uniformed police officer who is attempting to determine the identity of a driver of a motor vehicle." Md.Code (1977, 1987 Repl.Vol.), § 16–112(e) of the Transportation Article. For the reasons explained above, Rohrback had no duty to disclose that crime.

▪ Neither at the time of arrest, nor in the booking procedure, had Asbury committed the offense of making a false statement to a police officer, in violation of Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 150. That offense requires an intent to cause an investigation or other action of the same general nature. *See Choi v. State*, 316 Md. 529, 546–48, 560 A.2d 1108, 1116–17 (1989). And no one argues here that, before the commissioner, Asbury committed common law perjury or any form of statutory false swearing.

▪ But, Asbury's representing himself to the commissioner as Boland was a fraud within the meaning of Rule 1.2(d). It was material, inasmuch as prior convictions are one of the factors to be considered in a pretrial release determination. *See* Maryland Rules of Procedure, Rule 4–216(f)(8). "In concept, the dividing line drawn by ... Rule 1.2(d) is clear: a lawyer may discuss, explain, and predict the consequences of proposed conduct that would constitute crime or fraud, but a lawyer may not counsel or assist in such conduct. This subsection is thus a close relative of the criminal law of aiding and abetting, and the civil law of joint tort feasance." *Lawyering* § 1.2:502, at 47. The close question presented is whether Rohrback crossed the line and assisted Asbury's fraud.

### A

▪ On the record before us the evidence is legally insufficient to support a determination, under the clear and

convincing evidence standard, that Rohrback *assisted* Asbury in conduct that Rohrback knew was going to be a fraud on the commissioner. In this context " '[k]nows' denotes actual knowledge of the fact in question [which] may be inferred from circumstances." Preamble, Terminology, Appendix to Rule 1230, Maryland Administrative Rules.

Certainly, simply arranging for the bondsman to come to the lockup, even if the arrestee gave the police a false name, is not alone sufficient to demonstrate assisting client fraud. There was sufficient evidence, however, that Rohrback could have foreseen that Asbury would attempt to pass himself off as Boland before the commissioner. On the other hand, the uncontradicted evidence is that Rohrback, with Asbury's consent, told the bondsman Asbury's true identity and address. Asbury appeared before the commissioner with the bondsman, not with Rohrback. The agent for the corporate surety owed a duty of loyalty, including care, to his principal. There was a risk that the bail would be forfeited if it were known that the obligor used a false identity. Thus, the bondsman was an independent actor—a superseding cause. By arranging for the bondsman to come to the lockup, Rohrback participated in creating the occasion for Asbury's fraud, but Rohrback was not a joint participant in the fraud itself. Rohrback could, in effect, pass the problem on to the bondsman, after full disclosure to the bondsman.

Neither the bail bondsman nor Asbury testified at the hearing on the instant disciplinary charges. There is no evidence that any prior relationship between the bondsman and Rohrback was such that Rohrback "knew" that the bondsman would present Asbury to the commissioner as Boland. Had Rohrback, for example, passed off Asbury as Boland to the bondsman and then permitted the bondsman to take "Boland" before the commissioner, our conclusion on the Rule 1.2(d) charge might well be different.

If Rohrback had left the police station after hearing, in confidence, Asbury's intentions and after telling the bonds-

man the facts, Rohrback could not be said to have assisted Asbury's fraud, absent facts showing that the bondsman was Rohrback's mere instrumentality in carrying out Rohrback's assisting Asbury's fraud. In other words, Rohrback could have taken the position with Asbury that Rohrback had fulfilled the limited representation by getting a bondsman and then disassociated himself completely from Asbury's appearance before the commissioner. But Rohrback did not do so. Thus, the question becomes whether Rohrback's presence in some way assisted the fraud.

■ By remaining at the Southern District and being present in the room when the setting of "Boland's" bail took place, Rohrback came perilously close to assisting the fraud. We do not sustain the finding of violation, however, because on this record we do not know enough about the effect of Rohrback's presence. We do not know the size of the room and whether the commissioner was using an office or the courtroom of the District Court. We do not know how many arrestees, and members of their families, and friends might also have been milling about the room. We do not even know whether the commissioner knew that Rohrback was a lawyer, much less whether the commissioner knew that Rohrback was the lawyer for "Boland." Consequently, Bar Counsel did not demonstrate that Rohrback knowingly assisted Asbury in the fraud.

### B

■ Judge Wolff also concluded that Rohrback violated Rule 4.1(a)(2) on this occasion by " 'knowingly fail[ing] to disclose a material fact to a third person when disclosure [was] necessary to avoid assisting a ... fraudulent act by a client.' " [8] Even if Rohrback did not assist in advance of

---

**8.** Under the structure of the Rules of Professional Conduct we do not believe that fraud on a commissioner of the District Court is a fraud on a third person governed by Rule 4.1. Commissioners of the District Court exercise part of the judicial power of the State "with respect to warrants of arrest, or bail or collateral or other terms of

the appearance before the commissioner, the contention is that Rohrback should have disclosed to the commissioner that "Boland" was Asbury after the misrepresentation and the release on bail. That theory of violation necessarily is that the fraud was continuing, and that Rohrback was assisting the fraud by failure to disclose. We do not agree.

Once the misrepresentation had been made to the commissioner, it was a consummated act which Rohrback had not assisted. If Rohrback's legal representation of Asbury continued, then as counsel for the accused in a criminal case, Rohrback had no duty to disclose the fraud at that time, any more than he had a duty to disclose that Asbury had operated a motor vehicle when his license was suspended.

If Asbury's use of a false identity constituted a continuing fraud during the period of bail, then the following comment to Rule 1.2 on criminal, fraudulent and prohibited transactions would be relevant:

> "When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is not permitted to reveal the client's wrongdoing, except where permitted by Rule 1.6. However, the lawyer is required to avoid furthering the purpose, for example, by suggesting how it might be concealed."

Rule 1.6(b) is permissive. Failure to reveal that which may be revealed, as opposed to that which must be revealed, is not a basis for disciplinary action.

After the misrepresentation was made to the commissioner, Rohrback had a relatively substantial window of time before any other event would take place in the Baltimore

---

pre-trial release pending hearing, ... as prescribed by law or by rule." Maryland Constitution, art. IV, § 41G. It would seem that the relevant provision is Rule 3.3(a)(2), dealing with candor toward the tribunal. Inasmuch as the text of Rule 3.3(a)(2), dealing with disclosure to a tribunal, is tracked by Rule 4.1(a)(2), dealing with disclosure to a third party, our analysis, under the peculiar facts of the instant matter, is not affected.

City criminal case which would bring the ethical issue to a head. Rohrback's approach during this period was to tell Asbury to get someone else to represent him at trial, while continuing to counsel Asbury to make a clean breast of his "dual identity."

The instant matter may be compared with the facts in *State v. Casby*, 348 N.W.2d 736 (Minn.1984), a criminal prosecution of an attorney for the misdemeanor of deceit with intent to deceive a court. The client had been arrested for speeding and DWI but was charged only with speeding. The client gave his brother's name to the arresting officer. The attorney came to the lock-up to arrange for the arrestee's release. This was accomplished by a recognizance signed by the arrestee in his brother's name, opposite which the attorney signed her name. Thereafter the attorney plea bargained on behalf of the client and wrote a letter confirming the arrangement. Her conviction was affirmed. Speaking of the attorney's duty, the court said:

> "When she learned her client was perpetrating a fraud on the judicial system, she had a duty, as the district court panel put it, 'to advise against the continuation of such action, and if the client persisted, attempt to withdraw from the case. Even if withdrawal had then become impossible, she should have been careful to do nothing which in anyway aided her client's deception.' ABA Standard, *The Defense Function* § 7.7; *Lowery v. Cardwell*, 575 F.2d 727 (9th Cir.1978). She made no effort, however, to dissuade her client from persisting in his fraud."

*Id.* at 739.

In the matter before us Rohrback pursued the course of action which the Minnesota court said the attorney before it should have pursued. That court further said:

> "[I]t is difficult to see how Ms. Casby could have continued to represent Peter, even under the most passive conditions, without the danger of assisting the client's fraudulent conduct and preserving false evidence in violation of DR 7–102(A). But here appellant did more. She

knowingly undertook plea negotiations with the authorities based on the deceit including the writing of a letter to the authorities confirming those negotiations." [9]

*Id.*

Casby, the attorney whose conviction was affirmed, was the subject of disciplinary proceedings arising out of the same transaction. In *Matter of Casby*, 355 N.W.2d 704 (Minn.1984), the charges included a violation of Minnesota Code of Professional Responsibility DR 7–102(A)(7). By stipulation of the parties the disciplinary violations were factually supported by the plea negotiations and by the letter of confirmation. The opinion in the disciplinary case does not mention Casby's role in the client's release under a false name. By signing the recognizance, Casby's role in the release seems to have been greater than that shown to have been played by Rohrback in the release of "Boland."

## II

▮▮▮▮ We sustain Rohrback's exceptions to the Rule 3.3(a)(2) violation concerning the arraignment before Judge Williams. Asbury appeared before the Circuit Court for Anne Arundel County as Asbury. Asbury committed no fraud on that tribunal, so that Rohrback could not have assisted in any fraud. Judge Williams continued bail without inquiring of anyone involved whether there were any subsequent convictions. "If the circumstances [are] such that the court would treat the lawyer's silence as corroboration [of a client misrepresentation] (as would normally be the case), Rule 3.3(a)(2) requires the lawyer to volunteer the truth." *Lawyering* § 3.3:204, at 585. Before Judge

---

**9.** In the American Bar Association Model Code of Professional Responsibility, DR 7–102(A) provides in relevant part:
"In his representation of a client, a lawyer shall not:
. . . .
(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

Williams, all Rohrback did was corroborate that Asbury was entering a knowing and voluntary plea of guilty.

## III

It follows from the foregoing that Rohrback's exceptions to the violation of Rule 4.1(a)(2) involving Rohrback's dealings with the probation agent must be overruled. In a telephone conversation with Lambert, prior to the face-to-face meeting between Lambert, "Boland," and Rohrback, Rohrback misrepresented that his client was Boland. Thus, Rohrback's violation of the Maryland Rules of Professional Conduct in the representation of Asbury began at that point. Further, because counsel are almost never required to be present at a PSI interview, Rohrback's mere act of accompanying Asbury as Boland served as Rohrback's confirmation that Boland was the client's true name. This was a misrepresentation by Rohrback which actively assisted Asbury's concealment of his prior DWI convictions.

Rohrback's handling of Asbury's meeting with the probation officer in the Baltimore City case is analogous to defense counsel's substituting for the defendant at the trial of a criminal case some person other than the defendant. The latter conduct has been held to be criminal contempt, when done without the prior knowledge and permission of the court. *See United States v. Thoreen,* 653 F.2d 1332 (9th Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1428, 71 L.Ed.2d 648 (1982). The *Thoreen* court reasoned in part that the deception of the trial judge violated the Washington Code of Professional Responsibility, DR 1–102(A)(4) ("A lawyer shall not [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."). And *see Miskovsky v. State,* 586 P.2d 1104 (Okla.Crim.App.1978); *State v. Massad,* 334 P.2d 787 (Okla.1959); ABA Comm. on Ethics and Professional Responsibility, Informal Op. 914 (1966). In the case before us Rohrback, knowingly and actively, participated in Asbury's fraud on Lambert. By assisting Rohrback in the fraudulent suppression of a fact material to the PSI, Rohrback had the duty under Rule 4.1 to disclose

the material fact, and he failed to do so. Accordingly, Rohrback's exception is overruled as to this violation.

Rohrback points to the comment under Rule 4.1 discussing *"disclosure"* which reads: "However, the constitutional rights of defendants in criminal cases may limit the extent to which counsel for a defendant may correct a misrepresentation that is based on information provided by the client." Rohrback further points to the unique Maryland provision in Rule 3.3(e) ("[A] lawyer for an accused in a criminal case need not disclose that the accused intends to testify falsely or has testified falsely if the lawyer reasonably believes that the disclosure would jeopardize any constitutional right of the accused."). We agree with Rohrback that the quoted comment to Rule 4.1 and the express provisions of Rule 3.3(e) are directed to the same concerns. We do not see, however, how Rule 3.3(e) and the comment to Rule 4.1, if they are relevant, are determinative. Ordinarily a person awaiting sentence after a finding of guilty has no right of constitutional dimension to be represented by counsel at a PSI interview. Having chosen to be represented by privately engaged counsel, it is not even reasonably arguable that Asbury would be denied the effective assistance of counsel by the prohibitions in the Rules of Professional Conduct against Rohrback's confirming as true that which was fraudulent. *See Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (accused, dissuaded by defense counsel in criminal case from giving perjurious testimony, not unconstitutionally deprived of the effective assistance of counsel). Judge Wolff's finding that Rohrback did not reasonably believe that disclosure would jeopardize Asbury's constitutional rights is not clearly erroneous as to the fraud on Lambert.[10]

---

**10.** Amicus analogizes Rohrback's conduct toward Lambert to the use, by defense counsel at trial of a criminal case, of general questions designed to elicit narrative testimony from the accused, as a witness, when defense counsel believes it is likely that the accused will commit perjury. Because we rest our decision on Rohrback's own misrepresentation by his implicit confirmation of "Boland's" identity, the analogy sought by amicus does not lie.

## IV

 Bar Counsel, viewing the case as one involving a course of unethical conduct over three months, recommends a three year suspension. Counsel for Rohrback suggests that, even if any violation is sustained, the sanction should be no more than a reprimand. We recognize that the Maryland Rules of Professional Conduct had been in effect for less than one year when the violation occurred. We also recognize the great importance, particularly in criminal defense work, of maintaining client confidentiality. We are conscious of the difficulty which practitioners, courts, and commentators long have had in trying to define clearly the lines beyond which conduct becomes a disciplinary violation in the area of client confidences. We are mindful of the fact that Rohrback was not the creator of the deception. Nor did Rohrback receive a fee for attending the meeting with Lambert. There is no indication from Bar Counsel that Rohrback has ever committed any prior professional infractions in the more than twenty years that he has been a member of the bar of this Court. Nevertheless, the ultimate purpose of the fraud which Rohrback knowingly assisted was to deceive the District Court in Baltimore City concerning "Boland's" criminal record. For these reasons a majority of the Court concludes that a suspension of forty-five days is appropriate. Judges McAuliffe and Karwacki would suspend for ninety days.

 Rohrback's counsel in this Court, who did not represent Rohrback before Judge Wolff, requests that, if we decide to impose a sanction that is more severe than a reprimand in a published opinion, additional evidence in mitigation should be received, either on remand to Judge Wolff, or by affidavits filed in this Court. To justify this unusual request counsel for Rohrback submits that Bar Counsel opined to counsel who represented Rohrback before Judge Wolff that a reprimand in a published opinion would be the appropriate sanction here. Bar Counsel neither expressly acknowledges, nor categorically denies, the statement attributed to him. That is immaterial. Rohrback's

counsel has not indicated to us the nature of the mitigating evidence that was not presented. The record discloses that evidence relevant primarily, and indeed, perhaps exclusively, to mitigation was offered before Judge Wolff. Finally, even an explicit promise by Bar Counsel that a specific sanction would be recommended as a maximum to this Court would not be binding on us. This rule was well known to Rohrback's trial counsel who was even more experienced in these matters than present counsel. We deny the request to reopen the record.

IT IS SO ORDERED. RESPONDENT SHALL PAY ONE–THIRD OF ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST MAYNARD R. ROHRBACK.

CHASANOW, J., concurs in part and dissents in part and files an opinion.

CHASANOW, Judge, concurring in part and dissenting in part.

I concur in Part II of the majority opinion that Rohrback did not violate Rule 3.3(a)(2) of the Maryland Lawyers' Rules of Professional Conduct when he failed to disclose to Judge Williams the fact that his client had another charge under the name of Boland. I also concur with the majority in Part III that Rohrback did violate Rule 4.1(a)(2) in failing to disclose to the presentence investigator Asbury's false identity. I even concur with the majority on the sanction to be imposed. I disagree, however, with the majority's determination in Part I(A) that Rohrback did not violate the Rules of Professional Conduct while assisting Asbury in obtaining bond for the August 25 DWI offense.

At the hearing on the disciplinary charges before Judge Wolff, Rohrback testified:

"I ... was torn because I knew that he was being charged under Boland and he had the other charges under Asbury, and I wasn't sure whether I should say anything to the Commissioner or not, because Mr. Asbury had made it plain to me back in the lock-up that his main concern was getting out of that jail. That is what he had me there for, and he told me if they know about me being Asbury, they are either going to make me post a lot of bail or they might not even release me at all, so I don't want them to know. Said I am going to go through with it as Boland."

From this testimony and the other evidence before him, Judge Wolff was entitled to find, and did find, that Rohrback knew Asbury would fraudulently obtain bond by giving a false name to the commissioner. Indeed, the majority acknowledges that "Rohrback could have foreseen that Asbury would attempt to pass himself off as Boland before the commissioner." Majority Op. at 94. Knowing of Asbury's intent to secure release by fraudulently using a false identity, Rohrback should have refused to aid in Asbury's endeavor to obtain bail by deceitful means. Instead, Rohrback actively assisted Asbury's fraud for a fee of $250.00.

Rohrback acknowledged he was "dumb" in assisting Asbury's attempt to obtain release under the name of Boland. As Judge Wolff noted, Rohrback testified before the inquiry panel that:

"It was a dumb decision on my part to go there and bail him out under Boland. I should have done something right then and there, said I can't, I can't do it. He kept saying, you got to get me out, you got to get me out."

I believe Judge Wolff was correct when he concluded that Rohrback violated the Rules of Professional Conduct, Rule 1.2(d), by assisting a client in conduct that the lawyer knows is fraudulent. Rohrback knew Asbury was going to fraudulently use the name Boland to hide his prior record and secure his release. Knowing Asbury's intentions, Rohrback became an active participant in the fraudulent release.

Rohrback did not just give Asbury the name of a bondsman, nor did he simply call a bondsman to write the bail. Rohrback contacted a bondsman with whom he had prior dealings and convinced the bondsman that Asbury would be a good risk despite the fact that Asbury was using a false name. It was Rohrback, not Asbury, who met with the bondsman and arranged to have the bond written. Rohrback gave the bondsman Asbury's true name, but it is reasonable to infer that the bond was written under the name Boland, if not at Rohrback's direction, at least with his approval. Judge Wolff was not clearly erroneous when he concluded that Rohrback "arranged for a bondsman to write Asbury's bail bond under the name of Boland using Asbury's real address." Asbury's use of the name Boland was obviously a fraud on the court, and this was apparent to Rohrback. Asbury acknowledged to Rohrback that, if his true identity were known, "they are either going to make me post a lot of bail or they might not even release me at all...." Asbury was an alcoholic who continued to drive while intoxicated despite the suspension of his license and despite his prior convictions and pending charges. This was, at least, Asbury's fourth DWI arrest, his third within five years. He was driving on a Florida license under an assumed name because his Maryland license under his real name had been suspended as a result of his driving while intoxicated. In view of this pattern of habitual drinking and driving and disregard for the motor vehicle laws of this state, if released on bond, Asbury could be a potential danger to the community. Under these circumstances, Rohrback's actions in assisting in Asbury's fraudulent attempt to obtain release on bond were reprehensible. Rohrback should have either insisted Asbury make full disclosure of his true name or Rohrback should have refused to arrange for a bondsman to write the fraudulent bond.

I am at a loss to understand how the majority can find that Rohrback acted ethically and that "the bondsman was an independent actor—a superseding cause" and "Rohrback could, in effect, pass the problem on to the bondsman, after

full disclosure to the bondsman." Majority Op. at 94. I assume the majority is not suggesting that an attorney's ethical obligations can be "passed on" to a bail bondsman, or that attorneys do not have to fulfill their ethical obligations to avoid fraud because they may assume bail bondsmen will do so for them. Here, Rohrback did not even remotely suggest that he instructed the bail bondsman to write the bond under Asbury's true name. It should be obvious that "Lloyd Boland" would not be released pursuant to a bond written for "Lloyd Asbury" and that, if the bondsman disclosed Asbury's true name, any decision about bail would be quickly reevaluated. The bond was written by a bail bondsman under the false name "Boland," and since Rohrback made all the arrangements to have the bond written, the trial judge was not clearly erroneous in concluding that Rohrback "arranged for a bondsman to write Asbury's bail bond under the name Boland...." Judge Wolff properly found that procuring the bail bondsman and making the arrangements to have the bond written in a false name was tantamount to assisting a client in conduct the lawyer knew to be fraudulent, and thus, was a violation of Rule 1.2(d).

An attorney is in a delicate position when taking any action on behalf of a person who the attorney knows is perpetrating a fraud. The attorney must be careful to avoid assisting in the fraud and should anticipate that any actions will be closely scrutinized. I respectfully dissent from the majority's conclusion that Rohrback committed no ethical violation by assisting Asbury in obtaining release on bail under a false name.